IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WILLETTA PHINNESSEE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 11-cv-0263-MJR-CJP |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

REAGAN, District Judge:

This is an action for judicial review of agency action, brought under 42 U.S.C. § 405(g). Represented by counsel herein, Willetta Phinnessee (Plaintiff) seeks review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits. Defendant Commissioner filed a full transcript of the entire record of the administrative record, totaling just under 400 pages (referred to herein using the page numbers from the Court Transcript Index at Doc. 12-1, as "Tr. ___").

### A. Procedural History

Plaintiff applied for benefits in August 2007, alleging disability beginning on February 1, 2005 (Tr. 137, 140). Her application was denied initially and denied on reconsideration. After holding a hearing, ALJ Mitchell F. Stevens denied the application for benefits in a decision dated May 19, 2010 (Tr. 11-18). The Appeals Council denied review, and the decision of the ALJ became the final agency decision

(Tr. 3). Administrative remedies have been exhausted, and Plaintiff timely filed a complaint in this Court. She filed an amended complaint here in August 2011, and counsel have fully briefed the issues via memoranda filed December 13, 2011 and February 13, 2012 (*see* Docs. 15, 24, 28).

B. **Issues Raised by Plaintiff**

Plaintiff presents the following arguments.

1. The ALJ's credibility findings were erroneous.

2. The ALJ failed to account for all of Plaintiff's limitations in his assessment of her residual functional capacity (RFC).

C. **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A).**

---

[1] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. § 423(d)(3).** Limitations arising from alcoholism or drug use are *excluded* from consideration of whether a claimant is disabled. **42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535.** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. § 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, **649 F.3d 565, 568-69 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of

impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. § 404.1520;** *Simila v. Astrue***, 573 F.3d 503, 512-13 (7th Cir. 2009);** *Schroeter v. Sullivan***, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three but she cannot perform her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler***, 737 F.2d 714, 715 (7th Cir. 1984).** *See also Zurawski v. Halter***, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.... If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...." **42 U.S.C. § 405(g)**. Thus, this Court determines not whether Plaintiff is disabled but whether the ALJ's findings were supported by substantial evidence and whether any errors of law

were made.  *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996), *citing Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).  This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for substantial evidence, the undersigned Judge considers the entire administrative record but may not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute his own judgment for that of the ALJ.  *Lopez ex rel. Lopez v. Barnhart,* 336 F3d 535, 539 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### D. The Decision of the ALJ

ALJ Stevens followed the five-step analytical framework described above.  He determined that Plaintiff had not been engaged in substantial gainful activity since the alleged onset date.  He found that she had severe impairments of alcohol abuse and "psychological conditions variably diagnosed as different disorders such as depression and anxiety."

The ALJ rejected Plaintiff's allegation of a severe visual impairment.  He further determined that her impairments do not meet or equal a listed impairment.  The ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels, but she was limited to work involving no more than simple instructions and only occasional interaction with coworkers and supervisors.  There

was no testimony from a vocational expert. ALJ Stevens determined that Plaintiff was able to perform her past work as a hotel housekeeper.

## E. The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record focuses on the issues and arguments presented by Plaintiff.

### 1. Agency Forms

Plaintiff was born in 1959 and was 45 years old when she allegedly became disabled on February 1, 2005 (Tr. 174). She was last insured for DIB as of December 31, 2007 (Tr. 175). She had worked as a housekeeper in a hotel, a janitor, and a security guard. The longest job she had was as a housekeeper at The Residence Inn from 1995-1999 (Tr. 211). Her work history was sporadic. She had no earnings for the years 1990-1991, 1993-1994, and 2004. In the 15 years prior to the date of disability, she earned less than $5,000.00 every year except for 1996-1999 and 2001 (Tr. 156).

In a Disability Report, Plaintiff said that she was unable to work due to increased glaucoma and schizophrenia. She said she was able to see only the "outline/diagram of things." She also said she stopped working on February 1, 2005, because of "not enough hours" (Tr. 210).

Plaintiff finished the 6th grade in special education classes (Tr. 214-215). Plaintiff completed a Function Report in which she stated that she spends the day crying and walking from room to room. She said that she cannot comb her hair without crying, and she is afraid to go to the bathroom by herself. She does no household

chores.  She is scared of people.  She checked boxes indicating that she has problems in a number of areas of physical and mental functioning.  She did not, however, check the box for "seeing."  She said that she uses a walker (Tr. 227-239).  Plaintiff's sister also completed a Function Report.  She also indicated that Plaintiff had a number of physical and mental problems, but she did not check the box for "seeing." (Tr. 248).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on April 29, 2010 (Tr. 25).  The testimony and evidence included the following.

Plaintiff testified that she dropped out of school in the 6th grade because she got pregnant (Tr. 26-27).  She cannot read (Tr. 31-32).  She worked at a nursing home doing housekeeping and laundry for maybe two years (Tr. 32-33).

Plaintiff was convicted of selling crack cocaine, and she went to prison for three years (Tr. 33).

Plaintiff was seeing a psychiatrist about once a month.  She was taking Seroquel, Xanax and Lexapro (Tr. 36).  She testified that she had thoughts of suicide, and she heard voices (Tr. 38-39).

With respect to alcohol use, Plaintiff testified that she "was drinking pretty often" in the past, but she had learned that she could not drink while taking her medications (Tr. 40).

Plaintiff was living with her husband.  She testified that she did not do much during the day.  She watched television.  She sometimes made dinner for her husband. She had a driver's license but did not have a car to drive (Tr. 41-43).

Plaintiff's husband, Calvin Merritt, testified that they had been married for six years, and Plaintiff had not worked during that time (Tr. 43-44). Calvin had noticed Plaintiff talking to herself, as if she were having a conversation with someone, and he said Plaintiff had problems with concentration (Tr. 46, 49).

### 3. Medical Treatment

Plaintiff received mental health treatment from Dr. Katzman at Comprehensive Mental Health Center of St. Clair County. The earliest record is from January 2004. Plaintiff gave a history of psychiatric treatment at the age of 27, when she was hospitalized for a week after having overdosed. She had no further treatment until she was sent to prison for selling drugs. She saw a psychiatrist monthly while in prison and was prescribed medication. She quit taking the medication when she was released from prison. She drank alcohol off and on, and she was admitted to Gateway (a substance abuse treatment center). Plaintiff was prescribed Zyprexa and Prozac. She had been out of her medications since December 15, 2003. She had been fired several times, and her last job was two years ago. She was diagnosed with bipolar disorder and prescribed Paxil, Seroquel and Elavil; she was to return in 4 to 6 weeks (Tr. 380-381).

Plaintiff did not return to Comprehensive Mental Health until October 19, 2007. There, she was assessed by a social worker who noted that Plaintiff claimed to have been sober for three months, but she smelled of alcohol (Tr. 315-316).

In January of 2008, Plaintiff told Dr. Katzman that she was drinking whiskey, but she denied drug use. She complained of feeling nervous and scared. She was sleeping poorly and was nervous and depressed. On examination, she had no

overt psychosis, but she did have vague paranoid thoughts. The diagnoses were bipolar disorder and alcohol abuse. She was given four weeks worth of samples of the medications Lexapro and Seroquel (Tr. 365-366).

In February 2008, Plaintiff reported that she was not drinking because she was taking medication. She was sleeping better on Seroquel with no side effects (Tr. 364). But in April 2008, she reported that she had started drinking again. Her daughter had taken her to the hospital, and Plaintiff was admitted for two weeks. She admitted drinking beer on the day that she saw the doctor, and she smelled of alcohol. She was "very vague" about her medical history and whether she was taking her medications (Tr. 363).

In November 2008, Plaintiff told Dr. Katzman that the Seroquel made her too sleepy, so he decreased the dosage. Her husband was with her for that appointment, and Dr. Katzman noted that both Plaintiff and her husband were "very vague" regarding Plaintiff's drinking. The doctor counseled her regarding alcoholism and suggested she attend A.A. (Alcoholics Anonymous) meetings (Tr. 361).

In April 2009, she was again drinking, sometimes as much as twelve cans of beer a day. She had missed an appointment and needed to have her medications refilled. Dr. Katzman again counseled Plaintiff to attend A.A., and he added Elavil to her prescriptions (Tr. 360). In May 2009, the doctor noted that Plaintiff had not filled the prescription for Elavil that he had given her at the last appointment (Tr. 358-359).

The next visit to Dr. Katzman was in December 2009. It was noted that Plaintiff was appropriately attired, was responsive, had appropriate eye contact, was

enjoying the holiday season, and her health was okay. She was out of her medications (Tr. 356). In February 2010, Dr. Katzman noted that Plaintiff's medications were generally effective, but she was requesting an increase in the dosage. He noted that there were no side effects (Tr. 354-355). At the last visit, in April 2010, Plaintiff reported feeling scared and waking during the night. She had been arguing with her husband. She denied using alcohol. She had run out of Seroquel five weeks earlier and not been taking her medication (Tr. 352-353).

### 4. Consultative Examinations and RFC Assessments

Plaintiff's eyes were examined by Dr. Mark Nekola in August and December, 2007. In August, Dr. Nekola noted that Plaintiff had cataracts in both eyes, and she needed new glasses. He wrote that her "behavior was somewhat bizarre and actual level of visual impairment difficult to ascertain. Examination not entirely consistent with level of claimed impairment" (Tr. 274-276). In December 2007, after examining her again, Dr. Nekola wrote a report stating that Plaintiff claimed to have glaucoma, but he found no evidence of it. Furthermore, while Plaintiff had cataracts, they were mild to moderate and "are not consistent with her severe vision loss."

Dr. Nekola remarked that Plaintiff claimed her vision had become so bad that she could only see the outlines of people. He concluded that she was "a perplexing patient," a "bizarre historian," and "difficult to examine." Her results on the Goldmann visual field test were not "consistent with being able to walk in and out of a building"

without assistance.² Dr. Nekola's "overall impression is that the cataracts are producing a mild visual deficit and the remaining deficit is perhaps embellished" (Tr. 302-303).

Gregory C. Rudolph, Ph.D., performed a consultative psychological examination on October 30, 2007. Plaintiff told him that she had emphysema and that she was disabled due to depression. She did not mention having glaucoma or vision problems. She said that she had quit drinking five days earlier. She was able to take care of her personal needs, and able to do routine chores such as laundry and preparing simple meals. On examination, her speech was slightly slurred. Her thoughts were relevant, she was coherent, and she gave appropriate answers. She said she had been under the care of Dr. Katzman, but she was no longer taking medication. Her mood was depressed, and her affect was anxious. She was oriented to time, person and place. Her memory for recent and remote events was appropriate. She had good knowledge of general information and was able to do simple calculations. She was able to use simple reasoning skills, but her judgment was limited (Tr. 277-280).

In May 2008, a state agency consultant completed a Psychiatric Review Technique form indicating that Plaintiff's condition did not meet or equal a listed

---

² The Goldmann visual field test requires the patient to sit about three feet from a screen with a target in the center. The patient is asked to stare at the target and tell the examiner when the patient is able to see an object that moves into the patient's side vision. *See* http://www.nlm.nih.gov/medlineplus/ency/article/003879.htm, accessed on February 29, 2012.

impairment (Tr. 324-337). More specifically, on May 19, 2008, state agency consultant Howard Tin, Psy.D., assessed Plaintiff's mental RFC. Dr. Tin opined that Plaintiff either had no limitation or was not significantly limited in most areas of functioning. She was moderately limited in ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in proximity to others without being distracted, interact with the general public and accept instruction and criticism from supervisors. She had no marked limitations in any area. Dr. Tin concluded that Plaintiff was able to understand, remember and carry out short and simple instructions. She was able to perform simple tasks but should be limited to work that did not require interaction with the general public (Tr. 338-341).

A second consultative examination was done by Harry J. Deppe, Ph.D., on March 5, 2009. Plaintiff told Dr. Deppe that she had been treated for alcohol dependence about six months earlier at St. Mary's Hospital in East St. Louis, Illinois, and that she last used alcohol one week prior. She said that she had gotten out of prison in 1998. She had been charged with DUI three years prior to the examination. She had lost her driver's license, and she had failed to appear for a court hearing. She was arrested for failure to appear about one month prior to the examination. She was taking medications prescribed by Dr. Katzman, which she said helped her. She was sleeping "pretty good" on the medications. On examination, her mood was within normal limits. She had no formal thought disorders. She was oriented, and her fund of general knowledge was adequate. Her memory for recent and remote events was good.

Her immediate memory was fair. Simple reasoning skills were within normal limits. Abstract reasoning skills, judgment and insight were fair. Dr. Deppe rated as "fair" Plaintiff's ability to relate to others, understand and follow simple instructions, maintain attention for simple repetitive tasks, and withstand the stress of day-to-day work (Tr. 342-350).

   **F.**   <u>**Analysis**</u>

Plaintiff first argues that the ALJ failed to properly assess her credibility. This argument does not withstand scrutiny.

Notably, the ALJ did not express his credibility findings in the boilerplate language often used in ALJ decisions which repeatedly has been criticized by the Seventh Circuit Court of Appeals. *See Bjornson v. Astrue*, -- F.3d --, 2012 WL 280736, **\*4-5 (7th Cir. Jan. 31, 2012), and cases cited therein.** Rather, ALJ Stevens devoted two and one-half pages of his decision to a detailed discussion of Plaintiff's credibility in light of the evidence (Tr. 12-14).

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, **207 F.3d 431, 435 (7th Cir. 2000).** Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, **395 F.3d 737, 746-47 (7th Cir. 2005)**.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." **SSR 96-7p, at *3.**[3] Here, ALJ Stevens concluded that Plaintiff was not truthful about the severity of her work-related limitations. He stated his reasons for finding Plaintiff to be less than fully believable. The factors that he considered are appropriate. **20 C.F.R. § 416.929(c); SSR 96-7p.**

As the ALJ pointed out, the record is replete with evidence indicating that Plaintiff was not telling the truth about her condition. She told Dr. Nekola that she had glaucoma when she did not. She performed so badly on the Goldmann visual field test, which depends on the patient's cooperation, that, had the results been valid, she would not have even been able to see well enough to walk in and out of a building. Dr. Nekola concluded that the cataracts caused only a mild visual deficit, and Plaintiff's claims of vision loss were "embellished." Despite having only a mild visual deficit, when Plaintiff first appeared at the social security office, she held the forms very close to her face as if she could not see. While smelling of alcohol, she told a health care worker that

---

[3] Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." *Lauer v. Apfel*, **169 F.3d 489, 492 (7th Cir. 1999)**. Social Security Rulings are "binding on all components of the Social Security Administration." **20 C.F.R. § 402.35(b)(1)**. They do not, however, "have the force of law or properly promulgated notice and comment regulations." *Lauer* **at 492.**

she had been clean and sober for three months. Lastly, Plaintiff's testimony about her daily activities was contradicted by her statements to Dr. Rudolph and Dr. Deppe.

The ALJ found it significant that Plaintiff claimed a number of physical limitations (lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, etc.), but she "did not seek treatment indicative of her allegations" (Tr. 14). Furthermore, the records of Plaintiff's medical treatment did not support the limitations she claimed. This is a proper consideration, since "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, **539 F.3d 473, 483 (7th Cir. 2008)**.

Plaintiff argues that the ALJ did not consider the side effects of her medications. She testified that she slept during the day, which the ALJ noted. It is true that the ALJ did not specifically discuss the veracity of this testimony. However, Dr. Katzman repeatedly documented that Plaintiff had no side effects from her medications (*see* Tr. 309-310, 320-321, 353, 359, 363-364). Since Plaintiff's claim of side effects was completely contradicted by the medical evidence, any failure to discuss this point specifically was harmless. *See McKinzey v. Astrue*, **641 F.3d 884, 892 (7th Cir. 2011).**

Plaintiff also faults the ALJ for not making separate credibility findings about her husband's testimony. However, separate findings are not required where the witness' testimony is not a separate line of evidence but only serves to corroborate the Plaintiff's testimony. *Books v. Chater*, **91 F.3d 972, 980 (7th Cir. 1996);** *Carlson v. Shalala*, **999 F.2d 180, 182 (7th Cir. 1993).**

In short, the ALJ considered the appropriate factors and built the required bridge from the evidence to his conclusions about Plaintiff's testimony. *Castile v. Astrue*, **617 F.3d 923, 929 (7th Cir. 2010).** The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." *Simila v. Astrue*, **573 F.3d 503, 517 (7th Cir. 2009).** ALJ Stevens' analysis is far from patently wrong.

Plaintiff's second point is that the ALJ should have included limitations arising from her limited vision and her mental impairments in his assessment of her RFC. RFC is "the most you can still do despite your limitations." **20 C.F.R. § 1545(a).** In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record. *Id.* Obviously, the ALJ cannot be faulted for omitting alleged limitations that are not supported by the record.

Plaintiff points to no credible evidence that she had anything more than a mild visual deficit resulting from cataracts. She suggests that such loss would interfere with her ability to work at heights or with machinery. The ALJ concluded that she was able to do her past work as a hotel housekeeper, which did not, by her own description, include working at heights or with machinery, other than a vacuum cleaner. She told Drs. Rudolph and Deppe that she cooked, cleaned and did laundry. There is no credible evidence that her mild visual deficit would interfere with her ability to work as a hotel housekeeper.

With respect to her mental limitations, Plaintiff argues that the ALJ should have accounted for the fact that she did not sleep well. She cites to notations by Dr.

Katzman that she sometimes made this complaint. However, Plaintiff ignores the occasions on which she reported to Dr. Katzman that she was sleeping better (*see* Tr. 362, 364). She also told Dr. Deppe that she slept well when taking her medication (*see* Tr. 344). In any event, Plaintiff points to no particular functional limitation arising out of intermittent difficulty sleeping.

The ALJ's RFC assessment was consistent with Dr. Tin's assessment. In making his assessment, Dr. Tin was aware that Plaintiff reported poor sleep (Tr. 336). The ALJ accepted the mental limitations assessed by Dr. Tin. It is proper for the ALJ to rely upon the assessment of a state agency consultant. ***Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005); *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993).** Plaintiff has not demonstrated that ALJ Stevens erred in not adding limitations beyond those assessed by Dr. Tin.

### G. Conclusion

After careful review of the record as a whole, the Court finds that ALJ Stevens committed no errors of law, and his findings are supported by substantial evidence. Accordingly, the undersigned Judge **AFFIRMS** the final decision of the Commissioner of Social Security denying Willetta Phinnessee's application for DIB and SSI. The Clerk of Court **shall enter judgment** in favor of Defendant and against Plaintiff.

IT IS SO ORDERED.

DATED March 9, 2012.

s/ ***Michael J. Reagan***
MICHAEL J. REAGAN
United States District Judge